Ivan C. ERICSON, Respondent,

v.

LENERTZ, INC., Liberty Mutual Insurance Company, Respondents,

and

Minnesota Workers' Compensation Assigned Risk Plan, Relator,

State Treasurer, Custodian of the Special Compensation Fund, Respondent.

No. CX–85–1997.

Supreme Court of Minnesota.

May 23, 1986.

Mary A. Rice, St. Paul, for appellant.

Patrick A. Farrell, South St. Paul, for Lenertz.

Thomas G. Lockhart, Sp. Asst. Atty. Gen., St. Paul, for Compensation Fund.

Raymond R. Peterson, Minneapolis, for Ericson.

Darrell M. Hart, St. Paul, for Liberty Mut.

SIMONETT, Justice.

Relator Minnesota Workers' Compensation Assigned Risk Plan seeks review of a decision of the Workers' Compensation Court of Appeals which, following reference to a compensation judge for an evidentiary hearing, vacated an award on stipulation on the grounds of mistake of fact and law. We conclude respondent-employee Ivan C. Ericson did not make a sufficient showing of mistake of fact and that the provision for attorney fees did not involve mistake of law.

On many occasions we have recognized the Workers' Compensation Court of Appeals has broad, though not unlimited, discretion to set aside an award for "cause" pursuant to Minn.Stat. § 176.461 (1984). *Krebsbach v. Lake Lillian Co-op. Creamery Association*, 350 N.W.2d 349 (Minn. 1984); *Maurer v. Braun's Locker Plant*, 298 N.W.2d 439 (Minn.1980). Yet we have also recognized that settlements of disputed claims are usually beneficial to injured employees and have held that some caution should be exercised in setting aside awards in order to encourage employers and insurers to settle claims. *Maurer*, 298 N.W.2d at 441.

With these principles in mind, we turn to the facts in this case. Employee Ericson filed a claim petition in January 1983 seeking compensation for temporary total and permanent partial disability alleged to have resulted from injuries sustained on July 22, 1982, while he was employed as a truckdriver by relator Lenertz. Because of a coverage dispute, relator Assigned Risk Plan and respondents Liberty Mutual and the

special compensation fund were also joined as parties. All denied that Ericson had sustained the claimed injuries and disabilities, and all denied that he was Lenertz' employee. However, the special compensation fund obtained a temporary order on April 18, 1983, and paid medical expenses of about $7,000. It also commenced paying Ericson temporary total disability benefits from October 18, 1982, totalling $15,408.60 by May 15, 1984 (withholding a portion to apply on Ericson's potential attorney fees).

In July 1983 Ericson substituted Attorney D. Randall Boyer and his St. Paul law firm as counsel. In January 1984, Ericson filed an amended claim petition alleging his work injury occurred on April 30, 1982, as well as on July 22. Mr. Boyer initiated settlement negotiations in February 1984, culminating in a stipulation for settlement executed by the parties on May 29, 1984. In this settlement the special compensation fund took the position that the payments it had made under the temporary order had been made under mistake of fact and law, but waived any claim for reimbursement of those payments. The settlement provided that relator and the respondent insurers would pay Ericson's attorneys their costs of $823.87 and would pay Ericson $14,-017.50 for a 15% permanent partial disability to his back and $12,658.63 for temporary total disability, but that $6,500 would be withheld from those amounts and paid to Ericson's attorneys as their fees. The settlement provided also that all claims, past, present, or future, for disability—permanent partial, permanent total, temporary partial, and temporary total—would be closed out. It did not foreclose claims for future medical expenses and for rehabilitation or retraining, but relator, the respon-

dent insurer, and the special compensation fund reserved the right to assert all defenses set forth in the settlement (denial of employment relationship, denial of jurisdiction in Minnesota because Ericson allegedly had worked under a Wisconsin contract of hire and had been injured there, and coverage issues) against such claims.

The settlement was submitted to Compensation Judge J.E. Murray on June 5, 1985. He contacted Ericson's attorney, questioning the deduction of $6,500 for attorney fees from the total proceeds of $26,-676.13. Mr. Boyer had left the firm in early May 1984, but Susan Elfstrom, the attorney then assigned to the case, responded with a letter stating that, because the amount paid under the temporary order had also been in dispute, Minn.Stat. § 176.-081, subd. 1 (1984) authorized a $6,500 fee.[1] Elfstrom also filed a waiver of objection to the award of $6,500 fees signed by Ericson. The waiver stated Ericson's understanding that the attorney fees were based on the total disputed benefits of $42,084.73. After receiving the explanatory letter and the waiver, the compensation judge filed an award based on the settlement.

A few months later Ericson consulted his present attorney, Raymond Peterson. On September 26, 1984, Mr. Peterson filed a motion to set aside the stipulation and award, alleging that Ericson had understood the settlement to mean that he would continue to receive weekly disability benefits, that it was extremely doubtful Ericson would be capable of working in the near future, and that the stipulation had been unfair and unreasonable. Relator and the other respondents objected to the motion, and the Workers' Compensation Court of Appeals, in an appropriate exercise of its

---

1. Minn.Stat. § 176.081, subd. 1(a) (1984) provides:

   Subdivision 1. (a) A fee for legal services of 25 percent of the first $4,000 of compensation awarded to the employee and 20 percent of the next $27,500 of compensation awarded to the employee is permissible and does not require approval by the commissioner, compensation judge, or any other party except as provided in clause (b). If the employer or the insurer or the defendant is given written no-

tice of claims for legal services or disbursements, the claim shall be a lien against the amount paid or payable as compensation. In no case shall fees be calculated on the basis of any undisputed portion of compensation awards. Allowable fees under this chapter shall be based solely upon genuinely disputed portions of claims, including disputes related to the payment of rehabilitation benefits or to other aspects of a rehabilitation plan.

discretion, referred the matter to the Office of Administrative Hearings for reference to a compensation judge for an evidentiary hearing on the issue of "whether or not there was mistake made by the employee as to what the terms of the Stipulation for Settlement provided for."

At the hearing Ericson testified that before he signed the settlement on May 29, 1984, Ms. Elfstrom had explained only that "the cash was in the twenties." He said that he had understood he would receive a lump sum of cash, "weekly benefits" which would continue during rehabilitation, and that he would "automatically" receive rehabilitation benefits if the settlement was approved. He thought Ms. Elfstrom had given him an opportunity to read the stipulation but said he did not do so because "I figured she'd read it." He claimed that he did not understand what reserving primary defenses meant and that he had understood on May 29, 1984, that there was a "question" about whether the special compensation fund would pay his attorney fees. He admitted that when he signed the waiver on June 11, 1984, he knew the fees were $6,500 and would be deducted from the settlement proceeds. On cross-examination Ericson said he was a high school graduate, had been a policeman for several years, and had operated a service station. When questioned about whether the attorneys had discussed the settlement terms in detail with him, including what the settlement would close out, he claimed repeatedly he could not recall, but said it was "possible" that they did. In apparent explanation of his lack of recall, he said that "money was predominant with me." He also did not recall that Ms. Elfstrom went through the settlement with him page by page but said it was possible.

Ericson testified he could not recall whether Ms. Elfstrom told him the weekly benefit checks coming from the state would stop when the award was made. (The payments did not stop for several weeks due to the inadvertence of the special compensation fund.) He claimed at the hearing he did not know that these payments would stop, but in a deposition given 6 weeks earlier Ericson testified that Ms. Elfstrom had told him in May that the weekly payments would be made until the settlement was finalized. At the hearing he said that he could not recall having been told this, but that if it was in the depositon "it is probably true." He admitted that he had received temporary total disability benefits in 1980 for a prior injury and that after settlement of his claim those benefits had stopped. He also admitted knowing in May 1984 that the weekly benefits would stop at some point and that the only claims left open in the settlement were for rehabilitation and future medical expenses.

The sufficiency of employee's testimony to support the determination that the award should be vacated because he had misunderstood the effect of the settlement seems dubious to us. In *Schmidt v. De-Bough Manufacturing Co.*, (WCCA, filed September 17, 1984), the WCCA held that an employee who had been represented by counsel but claimed that he had not understood the settlement, that his attorney did not explain it to him, that he had difficulty reading and understanding technical language, and that his injuries had caused him mental confusion and memory problems, had not made a sufficient showing of mistake to justify setting aside the award. That decision was affirmed by this court without opinion on April 10, 1985. Similarly, in *Goldberger Foods, Inc. v. Lewis*, 367 N.W.2d 530 (Minn.1985), we agreed with a dissenting WCCA judge that an employee's averments that she had settled her claim because of financial distress and drug dependence which might have impaired her judgment when she consented to the settlement failed to make a strong showing of mistake, particularly when she had been represented by counsel and did not claim that she had not received legal advice.

As in *Goldberger Foods*, the employee here did not deny having received advice on the meaning and effect of the settlement provisions and, in fact, concedes that he may have received such advice. Both of his former attorneys testified to lengthy discussions with their client. Attorney

Boyer said he had frequent contacts with Ericson from the time of their first consultation in May 1983 and that he carefully explained the primary liability and independent contractor defenses, the significance of a full and final settlement, and what reserving defenses with respect to future medical and rehabilitation or retraining claims meant. It was his impression that Ericson understood the information and advice given him.[2] Boyer also said that after Ericson's deposition had been taken in January 1984 the special compensation fund's attorney threatened to have the temporary order terminated and agreed not to do so only because the parties were making progress in settlement negotiations. This attorney also informed Boyer near the end of April that the fund would not allow the withheld portions of the compensation payments under the temporary order to be used for attorney fees. Boyer said he explained this to Ericson, and Ericson then gave him authority to settle the case and was very eager to have the settlement made.

Ms. Elfstrom testified Ericson was in daily contact with her between May 7 and May 29 to learn if the settlement had been drafted and could be executed. She said that when Ericson came into her office on May 29 to sign the document, she asked him to sit in a conference room and to read the agreement for himself. She returned a short time later and, after Ericson said he had finished reading, reviewed it with him, summarizing several pages paragraph by paragraph and questioning him about whether he understood their meaning. She said that she read him the exact language setting forth the parties' intent to fully and finally settle all claims other than the medical and rehabilitation claims, the special compensation fund's waiver of any right to reimbursement, and the insurers' agreement to pay Ericson's attorneys their costs and to pay employee a total of $26,676.13 from which $6,500 was to be withheld and paid for his attorney fees. She did not

then discuss with Ericson the funds withheld under the temporary order as potential attorney fees, but told him that attorney fees were to be paid out of the settlement proceeds. She said also that after the compensation judge's inquiry about the settlement provision for attorney fees, she discussed this subject with Ericson on June 11, 1984. She then showed him that attorney fees were being calculated based on all benefits he had received and asked if he objected to this, to which he responded that he did not.

Without adverting to its holding in *Schmidt*, that when an employee is legally competent and has had legal counsel, his unsupported assertions that he had misunderstood the terms of a settlement are an insufficient showing of mistake, the WCCA determined that the settlement should be set aside because of "unique circumstances" similar to those found in *Alexander v. Kenneth R. LaLonde Enterprises*, 288 N.W.2d 18 (Minn.1980). We cannot agree. *Alexander* involved an employee who was awarded disability benefits after litigation. His attorney had failed to make a claim for nursing services furnished by the employee's wife and, because the attorney was not prepared to offer proof of their value at the hearing, the compensation judge granted a 30-day extension in which he could ascertain their value. At the resumed hearing the attorney and opposing counsel stipulated that the reasonable value of the services was $30 a week. Seven years later the employee sought vacation of the award for nursing services. In affidavits he and his wife stated that their former attorney had never consulted with them about the issue and had simply told them the employee would receive $30 a week. The former attorney was deposed and supported these affidavits. Although the facts did not fit precisely into the usual categories of cause for setting aside an award—fraud, mistake, newly discovered evidence, or a substantial change in the

---

**2.** Mr. Boyer testified that at one point employee desired even to close out future medical benefits.

employee's condition—we concluded that "the unusual facts in this case at the least indicate that through no fault of petitioner's the issue of compensation for nursing services was never considered in the original hearing." 288 N.W.2d at 20. This court added that the WCCA "could now well conclude that, through no fault of petitioner, the nominal amount of the original award was not based upon an informed stipulation." *Id.*

 Here, in contrast to *Alexander*, Ericson's former attorneys did not in any way support employee's claim of a mistaken understanding of the settlement agreement. Ericson did not contradict their testimony that they had repeatedly explained its terms to him. Indeed his testimony that "money was predominant" supports their testimony about his eagerness to get the case settled. We are compelled to conclude that the determination that Ericson was mistaken about the effect of the settlement is manifestly contrary to the evidence as a whole and was an abuse of the admittedly broad discretion vested in the Workers' Compensation Court of Appeals with respect to setting aside an award of compensation for cause.

■ The other ground on which the Workers' Compensation Court of Appeals vacated the award was that attorney fees of $6,500 were excessive and a mistake of law. In its view the settlement award was only $26,676.13, so application of the "25/20 formula" set forth in Minn.Stat. § 176.081, subd. 1 (1984) (see footnote 1, *supra*) did not allow a fee of $6,500. It is clear from the settlement itself, however, that the parties agreed Ericson should receive total compensation of $42,084.73, all of which had been in dispute. Although the special compensation fund had paid Ericson $15,408.60 under the temporary order, the settlement plainly sets forth the position of the fund that these benefits had been paid under mistake of fact and of law, making them as much in dispute as the proceeds he received when the settlement was approved. The special fund also agreed in the settlement to waive any claim

for reimbursement for the benefits paid already, so Ericson's right to receive these benefits was established by the award on stipulation even though he had already received them. Under the circumstances we hold that the fee of $6,500 was permitted by Minn.Stat. § 176.081, subd. 1 (1984).

Reversed.