Mark E. CASSEM, Relator
(CX–90–2520), Respondent
(C7–90–2541),

v.

CRENLO, INC. and Aetna Life and Cas-
ualty Co., Respondents (CX–90–2520),
Relators (C7–90–2541).

Nos. CX–90–2520, C7–90–2541.

Supreme Court of Minnesota.

May 17, 1991.

Wayne J. Studer, Brian E. Larson, Larry J. Peterson & Associates, St. Paul, for relator.

David R. Vail, Sieben, Grose, Von Holtum, McCoy & Carey, Ltd., Minneapolis, for respondents.

## OPINION

SIMONETT, Justice.

This case involves a number of issues including "service" of an MMI report, what is a "subd. 3e" suitable job, the role played by monitoring period compensation, the assessment of penalties, and credit for mistaken payments.

In March 1984, while working for employer Crenlo, Inc., employee Mark Cassem sustained a *Gillette*-type back injury resulting in surgery and a 9–percent permanent partial disability. Cassem returned to work at Crenlo until January 1986, when he had a second back surgery resulting in an additional 6–percent permanent partial disability.[1]

After his second surgery in January 1986 Cassem was medically unable to return to work at Crenlo, and for the next 15 months, from January 1986 to September 22, 1987, he was unemployed. Cassem then took a full-time position, at $6.75 an hour, at IBM in Rochester, Minnesota. The position at IBM was classified as temporary, as it was only for certain contracts IBM was then completing. Cassem worked at IBM for 15 months from September 22, 1987, until December 31, 1988, when he was laid off for economic reasons.

From January 1, 1989, to April 2, 1989, Cassem was again unemployed. On April 2 he found employment briefly as a "gate keeper" at Menard's, and then at Rochester Armored Car as a security guard, working at $4.25 an hour. This employment required the employee to stand for long periods of time, which bothered his back, and there were no opportunities for advancement. In June 1989, Cassem left Armored Car and began working as a photo engraver at "Images on Metals" at $4 an hour. This employer was located only a few

---

1. In March 1987, following the second surgery, Cassem filed a claim for permanent partial disability benefits, claiming a second *Gillette*-type back injury. The compensation judge denied a second injury but awarded 6–percent additional disability for the original 1984 injury. This litigation wended its way through the system, eventually resulting, in 1989, in a summary affirmance by this court of the compensation judge's decision that Cassem had sustained a 15–percent permanent partial disability to the body as a whole as a result of a single *Gillette*-type injury occurring in March 1984. *See Cassem v. Crenlo, Inc.*, 41 Minn.Workers' Comp. Dec. 1071 (1989).

blocks from the employee's home in Kasson, Minnesota, and the job allowed Cassem to sit as needed as well as offering the possibility of advancement.

It is this post-injury employment history which gives rise to this appeal, particularly the first 3 months of 1989 when Cassem was without work after being laid off at IBM. While at IBM, Cassem was paid temporary partial disability benefits by Aetna Life and Casualty Company; after Cassem was laid off at IBM on December 31, 1988, Aetna began paying him temporary total benefits. Six weeks later, on February 14, Aetna stopped paying temporary total, claiming that the temporary total payments had been a mistake and that Cassem was entitled instead to monitoring period benefits.[2] Cassem objected to the discontinuance of temporary total.

While this objection was pending, Cassem, as previously mentioned, had found work in April 1989 and then at Images on Metal in June. After April, Aetna again paid temporary partial compensation, calculating these benefits on the wages Cassem had earned while at IBM. Some of these payments arrived at delayed and irregular intervals because Aetna required Cassem to submit pay stubs from his employment before it would pay.

The discontinuance proceeding finally came on for hearing before a compensation judge on February 16, 1990.[3] The judge ruled:

(1) Cassem was not entitled to temporary total compensation for the period beginning January 1, 1989, when he left IBM because temporary total compensation is only available for 90 days after an employee reaches maximum medical im-

provement, which here occurred on August 2, 1988;

(2) Cassem was not entitled to monitoring period benefits for the 3-month period beginning January 1, 1989, because the monitoring period ended before Cassem left IBM;

(3) Cassem's wages at Images on Metal represent his post-injury earning capacity and by basing its calculations on Cassem's IBM wages, Aetna underpaid Cassem's temporary partial compensation after he returned to work in April 1989 by $3,668.84;

(4) Cassem was not entitled to penalties for wrongful termination of temporary total compensation on February 14, 1988, because the allegedly wrongful termination was for benefits Aetna did not owe;

(5) Aetna wrongfully delayed payment of temporary partial compensation after April 1989, entitling Cassem to penalties in the amount of $917.21; and

(6) Aetna was entitled to a credit of $4,602.62 for the mistaken payments of temporary total compensation in January and February 1989, the amount to be deductible out of future benefits owed Cassem at a rate of 20 percent of each future benefit payment pursuant to Minn.Stat. § 176.179 (1990).

The Workers' Compensation Court of Appeals (WCCA) affirmed on all points, though it required some recalculation of the temporary partial benefits and penalty. The denial of monitoring period benefits was affirmed, but not because the monitoring period had expired; rather the WCCA held that a job characterized "from the beginning" as temporary employment can-

---

**2.** On April 27, 1989, Aetna wrote Cassem: "This letter is to advise you that the check that we have issued for $985.17 is for Monitoring Benefits. These benefits were in effect from January 1, 1989 to April 2, 1989 * * *."

**3.** The discontinuance proceeding giving rise to the appeal now before the court has a tortured history. In February 1989 Aetna filed a Notice of Intention to Discontinue temporary total benefits, which was denied. In April Aetna filed a Petition to Discontinue and a second Notice of Intention to Discontinue and Cassem countered

with a petition for penalties, but at the hearing the compensation judge ruled she had no jurisdiction because the permanent disability question was in the supreme court. Finally, after the supreme court had affirmed the permanent partial rating, the discontinuance matter came on for a third hearing before the compensation judge and resulted in the rulings described in the text which are now before us.

It is important in this case to remember the issues arise in the context of Aetna's petition to discontinue temporary total benefits.

not give rise to monitoring benefits under § 176.101, subd. 3e(b). Both parties seek review by certiorari. We affirm with one modification.

## I.

Before we discuss the specific rulings under review in this appeal, it may be helpful to set out briefly some of the kinds of benefits available to an employee who returns to work after an injury and the role played by monitoring period compensation.

After an employee is injured but before he or she can return to work, temporary total compensation is available at a rate of 66⅔ percent of the employee's pre-injury wages. Minn.Stat. § 176.101, subd. 1 (1990). Temporary total compensation will continue until the employee either returns to work, or the employee reaches the level of maximum medical improvement (or completes a retraining program) plus 90 days. Minn.Stat. § 176.101, subds. 3e, 3f (1990).

The kind of benefits available to an injured employee who has returned to work and has reached maximum medical improvement depends on the nature of the job to which the employee returns. If an employee is working at a job which returns the employee as nearly as possible to the economic status he or she would have enjoyed absent the injury, then impairment compensation is paid. Minn.Stat. § 176.101, subd. 3e(b). If an employee is working at a job which does not provide the requisite economic status under § 176.101, subd. 3e(b), he or she will receive economic recovery compensation instead. Minn.Stat. § 176.101, subd. 3p (1990).

Whether economic recovery benefits are owed rather than impairment compensation makes a monetary difference. The amount of impairment compensation is calculated by applying the percentage of permanent disability to a scheduled dollar figure which increases along with the percentage of injury. Minn.Stat. § 176.101, subd. 3b (1990). Economic recovery compensation is paid at a rate of 66⅔ percent of an employee's pre-injury wage over a scheduled period of weeks, again depending on the extent of disability. Minn.Stat. § 176.101, subd. 3a (1990). However, economic recovery compensation must be no less than 120 percent of the impairment compensation which would be paid if impairment compensation were being paid. Minn.Stat. § 176.101, subd. 3t (1990).

Temporary partial benefits are also available after an employee has returned to work and will run concurrently with either impairment compensation or economic recovery compensation. Minn.Stat. § 176.101, subd. 3h. *Gasper v. Northern Star Co.,* 422 N.W.2d 727, 730–31 (Minn. 1988). Temporary partial benefits, paid at a rate of 66⅔ percent of the difference between pre- and post-injury wages, are essentially wage loss compensation. *Cf. Patton v. Thompson Electric Co.,* 420 N.W.2d 596 (Minn.1988). Impairment and economic recovery compensation provide compensation for the employee's permanent injury. *Gasper,* 422 N.W.2d at 731.

Finally, where an employee returns to work at a job which provides the requisite economic status to satisfy § 176.101, subd. 3e(b), a monitoring period begins. Monitoring period benefits become due if the employee leaves work because of economic conditions during the monitoring period. Minn.Stat. § 176.101, subd. 3i (1990).[4] By definition, the monitoring period runs from the time the employee begins work for as many weeks as economic recovery compensation would be available under § 176.101, subd. 3a if such benefits were being paid. Minn.Stat. § 176.011, subd. 26 (1990). Monitoring period benefits are paid at the same rate as temporary total compensation (and economic recovery compensation), which is two-thirds of the pre-injury wage. Minn.Stat. § 176.101, subd. 3i(b).

Apparently the possible imposition of monitoring period benefits is thought to provide an incentive for employers to re-

---

**4.** "If an employee accepts a job under subdivision 3e and begins work at that job and is subsequently unemployed at that job because of economic conditions, other than seasonal conditions, the employee shall receive monitoring period compensation pursuant to clause (b)." Minn.Stat. § 176.101, subd. 3i(a) (1990).

hire employees to good jobs and keep them there. Altman, Benanav, Keefe & Volz, *Minnesota's Workers' Compensation Scheme: The Effects and Effectiveness of the 1983 Amendments,* 13 Wm. Mitchell L.Rev. 843, 883–85 (1987). It also may discourage employers from rehiring employees for a short time to terminate temporary total disability benefits and then letting them go.

## II.

■ Employee Cassem argues that he should receive temporary total benefits after he was laid off at IBM (from January 1, 1989) and until he was again employed (April 2, 1989). We affirm the denial of temporary total benefits.

Temporary total benefits being paid to a nonworking employee will terminate 90 days after the employee is *served* with a report stating that maximum medical improvement (MMI) has been reached. § 176.101, subd. 3e(a). Cassem claims he was never served with such a report; however, at the hearing before the compensation judge on August 2, 1988, Cassem and his attorney received a copy of the doctor's report which stated Cassem "has reached maximum medical improvement." Contrary to the employee's claim, both the compensation judge and the WCCA concluded that submission of the doctor's report at the hearing constituted effective service of the report for purposes of subd. 3e(a). We agree. Cassem and his attorney received the report and in a setting where its message would be brought home to the recipients.

## III.

■ If not entitled to temporary total benefits from January 1, 1989, to April 2, 1989, employee Cassem says he should be entitled to monitoring period benefits for that time period. At one time Aetna agreed Cassem was entitled to such monitoring benefits, *see* footnote 2, but it now says Cassem was not entitled to monitoring benefits because the monitoring period had expired. Cassem says the monitoring period had not expired.

After his initial 1984 injury resulting in 9–percent permanent partial disability, Cassem returned to his welding job at Crenlo. Obviously this was a suitable "3e" job, and it triggered the start of a monitoring benefit period of 54 weeks (9 percent of 600 weeks). Following his second surgery in 1986, Cassem was unable for medical reasons to return to Crenlo. He had, however, an additional 6–percent disability attributable to the *original* injury, which created a monitoring period of an additional 36 weeks (6 percent of 600 weeks). The compensation judge determined the initial monitoring period of 54 weeks was extended by 36 weeks to create a monitoring period of 90 weeks commencing with the initial return to work at Crenlo. Because Cassem had worked for 54 weeks at Crenlo plus 66 weeks at IBM, the compensation judge reasoned the monitoring period had expired prior to the IBM layoff. On the other hand, Cassem argues that a new 90–week monitoring period began with his return to work at IBM, and that when he left IBM after 66 weeks for economic reasons, he was then entitled, as of January 1, 1989, to monitoring benefits for 24 weeks. Cassem points out he left his post-injury employment at Crenlo because of his original work injury, which, he contends, meant he received temporary total benefits for a new period of total disability until MMI was reached for a second time. *See Sabby v. Copasan, Inc.,* 462 N.W.2d 603 (Minn. 1990). If this "renewed" or "reinstated" temporary total compensation ceased upon attainment of a new MMI, arguably the monitoring period should begin anew. We need not, however, resolve this issue.

As previously noted, the monitoring period begins when an employee returns to work at a "suitable job," and monitoring period benefits become due if the employee leaves that job because of economic conditions. § 176.101, subd. 3i (1990). Consequently, if the IBM job does not qualify as a "3e" suitable job, Cassem's argument for a new monitoring period must in any event fail. The WCCA held that the IBM job was not a suitable job. We agree.

A "3e" suitable job is work that the employee can do in his physical condition and which produces "an economic status as close as possible to that the employee enjoyed without the disability."[5] In analyzing the IBM position, the WCCA concluded "that a job characterized from the beginning as a 'temporary job' under a rehabilitation plan does not meet the requirements of § 176.101, subd. 3e." Here the record indicates that although the employee eventually stayed at IBM for 15 months, Cassem understood he was hired "only three months at a time" while the work on certain contracts might last. All parties agreed, as documented in the report of the Qualified Rehabilitation Consultant, that although the work might lead to a permanent position, the job was understood to be a temporary position.

Aetna argues that the WCCA has added a new factor of "permanency" to the definition of a "3e" job, a factor which is not in the statute. If permanency is a requirement, says Aetna, few jobs could qualify for "3e" status because much employment is vulnerable to economic layoffs. But to say that a job is "not permanent," as Aetna would put it, is not the same thing as saying a job is temporary. We think a temporary job, as that term is used in the labor market, is characterized by an inherent impermanence. Generally speaking, a temporary position has no future; the job is not expected to last long, tends to be episodic or transient, and is unlikely to carry with it expectations of any job enhancement, such as wage increases or seniority. Here, although the IBM job survived for 15 months, it was designated in the plan of rehabilitation as temporary and *from the beginning* was understood to be temporary, so that impermanence was inherent in the employment. Thus, the WCCA properly concluded that the position did not produce for Cassem an economic status as close as possible to his pre-injury welding job at Crenlo, which had been steady employment extending indefinitely. We agree.

At least, says Aetna, the question of whether the IBM job qualifies as a suitable job should be remanded to the compensation judge for "a factual determination."[6] We think the pertinent facts are not in dispute. The question, rather, is the legal significance to be given these facts. In other words, we think the issue here was predominantly a question of law which the WCCA could decide.

## IV.

■ (1) Aetna argues that the wage Cassem earned at IBM ($6.75 an hour) more

---

5. Minn.Stat. § 176.101, subd. 3e(b) (1986) reads in part:
    If * * * the employer furnishes work to the employee that is consistent with an approved plan of rehabilitation and meets the requirements of section 176.102, subd. 1, or, if no plan has been approved, that the employee can do in the employee's physical condition and that job produces an economic status as close as possible to that the employee would have enjoyed without disability, * * * temporary total compensation shall cease * * *.
    The underlined language was added in 1985, Act approved May 22, 1985, ch. 234, § 5, 1985 Minn. Laws 739, 745–46. Section 176.102, subd. 1, referred to in the 1985 amendment, refers to the scope of rehabilitation and says the aim is to enable the employee to obtain a job either related to his former job or "to a job in another work area which produces an economic status as close as possible to that the employee would have enjoyed without disability. * * * Economic status is to be measured not only by opportunity for immediate income but also *by opportunity for future income.*" *Id.* (emphasis added).

At oral argument, Aetna argued that prior to the 1985 amendatory language, a suitable "3e" job could be one consistent with a plan of rehabilitation but without an economic status as close as possible to a job the employee could have enjoyed without a disability. We think the 1985 amendatory language only clarified what was already the law.

6. The tenacity of the parties for continuing this litigation is remarkable, which perhaps is a commentary on the bewildering complexity of the system for delivery of workers' compensation benefits. Apparently Aetna is willing to renew the fight for monitoring benefits because, unlike economic recovery compensation, the monitoring benefits would be payable for only the 24 weeks allegedly left in the monitoring period.

   In any event, the WCCA in its decision denying monitoring benefits stated that the employee is still free to petition for economic recovery compensation (less the impairment compensation previously paid) pursuant to Minn.Stat. § 176.101, subds. 3f and 3p.

properly represents post-injury earning capacity for the purpose of calculating the amount of temporary partial benefits, rather than, as found by the compensation judge, Cassem's earnings at Images on Metal ($4 an hour). We cannot say the compensation judge and the WCCA erred.

Aetna's own expert testified that the IBM job exceeded Cassem's earning capacity. Other experts estimated the employee's earning capacity was from about $5.11 to $4.25 an hour. Given Cassem's most recent employment at $4 an hour, the narrow margin between most of the estimates and the fact that they were only estimates, plus the testimony of Aetna's expert that Cassem's wages at Images on Metal were compatible with his abilities, vocational profile and earning capacity, the compensation judge's finding of $4 an hour is sustainable. *See Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 59 (Minn.1984).

■ (2) Cassem claims he should be entitled to penalties for Aetna's wrongful termination of temporary total benefits in February 1989. Aetna served a Notice of Intention to Discontinue on him but not on his attorney. *See* subdivisions 1 and 8 of section 176.238 (1990). Also, there was in effect at the time an order of the Commissioner of Labor and Industry requiring Aetna to continue payment of temporary total benefits. *See* footnote 2, *supra*. The compensation judge ruled (and we have agreed) that Aetna did not owe temporary total compensation benefits. *See* Part II, *supra*. It seems to us reasonable to conclude, as the compensation judge did, that it makes no sense to penalize the insurer for stopping payments it did not owe.

■ (3) The compensation judge did, however, assess penalties against Aetna for wrongful delay in payment of temporary partial benefits after Cassem returned to work in April 1989. § 176.225, subd. 1 (1990). Aetna appeals. We affirm.

Cassem testified that he sent his pay stubs from Images on Metal to Aetna but that Aetna claimed they never arrived, so he began sending the pay stubs to his attorney for forwarding to Aetna. Aetna's representative testified that after the pay stubs arrived it would take over a week to process them. The compensation judge found, however, that Aetna did not use the pay stubs. Aetna knew Cassem was working at Images on Metal but it was calculating the benefit payments according to Cassem's higher wages earned at the prior IBM job. The compensation judge found, as he could, that Aetna's insistence on receiving the pay stubs was unreasonable and caused the employee to suffer due to delay in receiving his benefits. (The compensation judge noted that the penalty was not imposed because Aetna was using IBM wages in its calculations, but solely because of the delay.)

■ (4) In any event, says Aetna, the compensation judge should not have awarded 25 percent of the entire amount of unpaid temporary partial benefits, but rather the judge should have awarded only 25 percent of the four delayed payments. Section 176.225, subd. 1, provides that "compensation, in addition to the total amount of compensation award, of up to 25 percent of that total amount" may be awarded for unreasonably or vexatiously delaying payment. It seems to us a fair reading of the phrase "25 percent of that total amount" means just that, not 25 percent of only the payments delayed. We note the statute gives the judge discretion to award "up to" 25 percent, so the judge has some flexibility to keep the amount of the penalty commensurate with the harm done.

■ (5) The compensation judge ruled that Aetna could recoup its credit for mistakenly paid temporary total benefits ($4,602.62) by deducting 20 percent from each payment of future wage loss benefits. Aetna argues it should be allowed to use its credit as an offset to the $3,668.84 Aetna owes Cassem for underpaid temporary partial compensation (resulting from incorrectly basing its payments on the IBM wage).

We agree with the WCCA that § 176.179 (1990) only allows mistaken compensation to be taken as a full credit against "future lump sum benefit[s] entitlement," and that

the $3,368.84 represents an award for underpayment of benefits past due, not an award of a "future lump sum." Even so, we conclude § 176.179 does not cover the situation we have here where Aetna did not attempt to recover its credit when it started paying temporary partial benefits to Cassem. It makes practical sense, it seems to us, to allow Aetna to offset its overpayment against its underpayment. No hardship results to the employee. *Cf. Christianson v. Axel H. Ohman Const. Co.*, 346 N.W.2d 654, 656 (Minn.1984) (purpose of § 176.179 is to avoid hardship to employee if the credit exhausted completely the periodic benefits designed to make up for lower post-injury wages).

The employee is entitled to $600 attorney fees.

Affirmed as modified.

YETKA, Justice, took no part in the consideration or decision of this case.