William MONSON, Relator,

v.

WHITE BEAR MITSUBISHI, and Western National Insurance Co., Respondents.

No. CX–03–235.

Supreme Court of Minnesota.

June 12, 2003.

Hansen, Dordell, Bradt, Odlaug & Bradt, P.L.L.P., John H. Guthmann, Kathleen M. Daly, St. Paul, for Relator.

Aafedt, Forde, Gray & Monson, P.A., Michael D. Aafedt, Krista L. Twesme, Minneapolis, for Respondents.

## OPINION

GILBERT, Justice.

The Workers' Compensation Court of Appeals denied a petition to vacate an award on settlement agreement. We reverse and remand.

On March 28, 1991, William Monson sustained a work-related low back injury while working for White Bear Mitsubishi as an auto technician. Monson was 31 years old and earning a weekly wage of $595.95 on the date of injury. White Bear Mitsubishi and its workers' compensation liability insurer, Western National Insurance Company, admitted liability and paid workers' compensation benefits.

After conservative measures failed to alleviate Monson's low back symptoms, on November 21, 1994, Monson underwent anterior lumbar interbody fusion surgery with BAK cages at the L4–5 and L5–S1. That surgery failed and on June 19, 1995, Monson underwent facet fusion and augmentation surgery. His surgeon, Dr. John Dowdle, said "[t]he 5–1 level was fused solid and there was minimal or no motion that took place at the 4–5 level. There was a mild amount of motion with distraction."

■ Following the second surgery, when X-rays indicated "healing fusion at the 4–5 level," Dr. Dowdle released Monson to work with restrictions. Through rehabilitation efforts, on January 2, 1996, Monson started working for Kline Auto World (Kline) as an auto service writer.[1] When Monson's low back symptoms persisted, Dr. Dowdle ordered an MRI, the results of which were read as indicating that the "implants [were] in good position[;]" that there was "bridging bone anteriorly[;]" and "good bridging bone across the facet joint also." Monson was also referred to neurologist Dr. Thomas McPartlin who ordered an EMG, the re-

sults of which indicated "denervation of paraspinal muscles from the previous surgery" in 1994 but "no evidence of a radiculopathy."

Monson's back-related symptoms persisted. Dr. Dowdle restricted Monson from working and started him on a regular walking program. When additional diagnostic studies indicated "no substantial significant nerve root compression," Dr. Dowdle referred Monson to the Pain Management Program at United Hospital. Monson participated in United's Pain Management Program, under the direction of Dr. Todd Hess, from July 8, 1996 through August 9, 1996. At the end of the program, Dr. Hess noted that Monson described improvement in his outlook but continued to suffer fairly significant and limiting pain. Dr. Hess recommended continued psychotherapy and acupressure.

In a follow-up exam with Dr. Hess on January 2, 1997, Monson said that he was not improving; and on February 12, 1997, Monson told Dr. Hess that there had been "no improvement whatsoever" and that there was "absolutely no way" he could return to work. They discussed work-related and pain-related issues at length. Dr. Hess, believing that a return to work would be in Monson's best interest, asked Monson to reassess his "adamancy" about his total disability; and on March 14, 1997, the doctor released Monson to return to work with restrictions. The doctor also recommended continued counseling and pool therapy.

*Cassem v. Crenlo, Inc.*, 470 N.W.2d 102, 105 (Minn.1991) (citation omitted). Because of the 1991 date of injury, the limitation on temporary partial disability compensation for injuries on and after October 1, 1992 was inapplicable. Act of April 28, 1992, ch. 510, art. 1, §§ 10, 14, 1992 Minn. Laws 589, 596, 598.

1. Although Monson was able to return to full-time employment, he did so at a significant wage loss, resulting in the payment of ongoing temporary partial disability compensation. Temporary partial disability compensation, paid at a rate of 66–2/3 percent of the difference between pre- and post-injury wages, is essentially wage loss compensation.

Monson returned to work as a booker, and later as a dispatcher with Kline. In followup visits with Dr. Hess in 1997 and 1998, Monson continued to report back pain; and Dr. Hess continued Monson on a pain regimen of medication, pool therapy and exercise. On September 15, 1998, Dr. Dowdle issued a report stating that Monson was seen in followup, that Monson was working fulltime, and that Monson was "tolerating it reasonably well." The report further stated that Monson was at maximum medical improvement and rated his permanent partial disability at 22.5 percent for a two-level fusion pursuant to Minn. R. 5223.0070, subp. 1.D. (1991).

On November 30, 1998, Monson's vocational consultant (VC) reported that he had contacted Monson to review his medical status and return-to-work situation. Monson told the VC that he had experienced an increase in low back and leg symptoms but was unsure why that had happened. Monson and his VC also discussed transferring Monson's pain management care from Dr. Hess to Monson's family physician so as to alleviate the necessity for Monson to miss work to meet with Dr. Hess.

In December 1998, Monson and Mitsubishi/Western National negotiated a settlement for $112,500. The agreement also provided that $13,000 in attorney fees, previously withheld from past benefits paid, would be released to Monson's attorney. The settlement agreement recited that Monson claimed he was entitled to ongoing temporary partial disability benefits as well as permanent partial disability benefits at the economic recovery compensation rate (less impairment compensation already paid) and retraining benefits;[2] that White Bear Mitsubishi/Western National claimed that Monson was not entitled to retraining and that permanent partial disability benefits had been fully paid at the impairment compensation rate; and that in compromise of the disputed claims, with the exception of future medical bills, Monson accepted the lump sum payment as a "full, final and complete settlement" of all claims arising out of the injury of March 28, 1991. White Bear Mitsubishi/Western National reserved all defenses arising out of future workers' compensation claims of Monson. The settlement agreement was approved and an award issued on December 14, 1998.

2. Under the law applicable to Monson's injury, if the injured worker did not receive an offer of employment that was physically and economically suitable within 90 days of reaching maximum medical improvement, permanent partial disability benefits were payable as economic recovery compensation. Minn.Stat. § 176.101, subds. 3e(b), 3p (1990) (repealed 1995). If the employer did furnish such employment to the injured worker, the worker received benefits payable as impairment compensation. *Id.*, subds. 3b, 3e(b) (1990) (repealed 1995). "Whether economic recovery benefits [were] owed rather than impairment compensation [made] a monetary difference." *Cassem*, 470 N.W.2d at 105. The amount of impairment compensation was calculated by matching the percentage of permanent disability with a corresponding dollar figure; the higher the percentage of disability, the higher the scheduled dollar amount to which the injured worker was entitled. Minn.Stat. § 176.101, subd. 3b (1990) (repealed 1995). Economic recovery compensation, however, was calculated as 66–2/3 percent of the injured worker's pre-injury wage over a scheduled period of weeks; the higher the percentage of disability, the longer the payments continued. *Id.*, subd. 3a (1990) (repealed 1995). Economic recovery compensation could not be less than 120 percent of the amount of impairment compensation. *Id.*, subd. 3t (1990) (repealed 1995). As indicated, in 1995, the legislature eliminated the two-tier system in favor of a uniform schedule for all permanent partial disability compensation, applicable to injuries occurring after October 1, 1995. Act of May 25, 1995, ch. 231, art. 1, §§ 19–21, 1995 Minn. Laws 1977, 1989–91 (codified at Minn.Stat. § 176.101, subd. 2a (2002)).

Monson apparently lost his job with Kline in February 1999. Around the same time, he had an increase in back pain. On March 27, 1999, Monson was hospitalized for an acute onset of low back and right hip pain. Monson's symptoms persisted, and on June 16, 1999, he was seen by Dr. Joseph Perra at the Twin Cities Spine Center on referral of Dr. Hess. After obtaining Monson's medical history and new X-rays, Dr. Perra noted what he described as "obvious and significant lucencies around * * * the [BAK] cages at L5–S1" and "very slight, mild lucency around the cages at L4–5." Dr. Perra diagnosed chronic back and leg pain with "[p]seudoarthrosis at least at L5–S1, possible L4–5."[3]

On September 30, 1999, Monson underwent surgery for cage removal, repair of pseudoarthrosis and posterior stabilization with screw/rod regrafting and decompression. On October 4, 2000, Dr. Perra noted that while Monson had improved somewhat, he continued to have severe pain. The doctor concluded that Monson had reached a "plateau" and was "likely completely disabled based on his degree of chronic pain and the medications necessary for this." About a week later, Dr. Hess also concluded that Monson was permanently totally disabled: "It just does not at this point appear that the patient is employable."

In a narrative report dated November 14, 2000, Dr. Perra stated his opinion that based on the June 16, 1999 examination and subsequent surgery, Monson's fusion at L5–S1 never solidly healed. The doctor said that the cages were loose at the time of the surgery in 1999 and that they had

clear lucency around them. It was his opinion that this was characteristic of an area that had never been healed and not of an area that had healed and then become loosened. Dr. Perra was not aware of any information suggesting that this was known to Monson's previously treating physicians.

On January 21, 2001, Monson was awarded social security disability benefits, retroactive to February 2, 1999.

In July 2002, Monson filed a petition to vacate the 1998 award on grounds of substantial change in condition, mistake and newly discovered evidence, appending his medical records, including the reports from Dr. Perra, and the settlement agreement. The Workers' Compensation Court of Appeals ("WCCA") denied the petition. Although the WCCA noted this was a "close case," it concluded that Monson had not proven an unanticipated increase in disability, that any mistake was not material and that evidence not in existence at the time of settlement was not newly discovered evidence for purposes of vacating the award. Monson sought review by certiorari. Minn.Stat. § 176.471 (2002).

### I.

At the outset, it is worth bearing in mind that a workers' compensation claim is not a private personal injury tort claim.

In the latter instance, settlements are, in a literal sense, "final and complete," putting to rest, once and for all, a dispute between the parties (absent fraud or mutual mistake). Workers' compen-

---

**3.** We note that one source has explained in part: "Criteria for a successful fusion included no lucency or motion on plain radiographs[.]" A. Ghanayem, M. Larson, & K. McDermott, *The Effect of Pulsed Electromagnetic Fields on the Quality of Cage–Instru-* *mented Lumbar Fusion in the Ovine Model,* 47th Annual Meeting, Orthopaedic Research Society, February 25–28, 2001, San Francisco, California, *available at* http://www.jbjs.org/ORS—2001/pdfs/0947.pdf (last visited May 29, 2003).

sation, on the other hand, is social legislation, providing a measure of security to workers injured on the job, with the burden of that expense considered a proportionate part of the expense of production. The system endeavors fairly and fully to compensate the meritorious injury claim. Consequently, the Workers' Compensation Act "permit[s] adjustment of the award in relation to facts subsequently appearing so as 'to assure a compensation proportionate to the degree and duration of disability.'" *Franke v. Fabcon, Inc.*, 509 N.W.2d 373, 376 (Minn.1993) (citations omitted). Provisions for reopening and modifying workers' compensation awards are a "recognition of the obvious fact, that no matter how competent a commission's diagnosis of claimant's condition and earning prospects at the time of hearing may be, that condition may later change markedly for the worse, or may improve, or may even clear up altogether." 8 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 131.01 (2002). That an award is made pursuant to a negotiated settlement rather than in a contested case has no bearing on the justification for reopening. *Id.* § 131.04(1).

Prior to 1992, Minnesota's reopening provision, Minn.Stat. § 176.461 (1990), provided that an award could be vacated "for cause," and case law identified cause as fraud, mistake, newly discovered evidence and substantial change in employee's condition. *Stewart v. Rahr Malting Co.*, 435 N.W.2d 538, 539 (Minn.1989) (citing *Krebsbach v. Lake Lillian Coop. Creamery Ass'n*, 350 N.W.2d 349, 353 (Minn.1984); *Turner v. Fed. Reserve Bank of Minne-*

*apolis*, 298 Minn. 161, 166–67, 213 N.W.2d 414, 417–18 (1973)). As amended in 1992, the statute now limits "cause" to (1) mutual mistake of fact; (2) newly discovered evidence; (3) fraud; and (4) "substantial change in medical condition since the time of the award that was clearly not anticipated and could not reasonably have been anticipated at the time of the award." Act of April 28, 1992, ch. 510, art. 2, § 11, 1992 Minn. Laws 589, 603 (codified at Minn. Stat. § 176.461 (2002)). "While the legislative history of the amendment indicates it was intended to be simply a codification of prior case law, it appears, at least with regard to a change in medical condition, that there has been a substantive change in the law." *Franke*, 509 N.W.2d at 376 (footnote omitted).[4]

Where settlements must conform to the law at the time of settlement, the law at the time of settlement applies for purposes of reopening awards. *Franke*, 509 N.W.2d at 377. The WCCA has broad though not unlimited discretion in determining whether to vacate an award. *Stewart*, 435 N.W.2d at 539 (citing *Ericson v. Lenertz, Inc.*, 387 N.W.2d 430, 431 (Minn. 1986); *Maurer v. Braun's Locker Plant*, 298 N.W.2d 439, 441 (Minn.1980)). The statutory objective for which this discretion is invested is to assure compensation proportionate to the degree and duration of disability. *Heath v. Airtex Indus.*, 297 N.W.2d 269, 272 (Minn.1980).

## II.

The development of new facts about the injury after the award, or even the subsequent discovery of facts in exis-

---

4. The reopening provision applies to awards of compensation by settlement agreement, by determination by a compensation judge and denials of compensation. *E.g., Franke*, 509 N.W.2d at 376 (vacating an award on stipulation); *Radzak v. Mercy Hosp.*, 291 Minn. 189,

194–95, 190 N.W.2d 86, 89 (1971) (affirming a denial of compensation); *Soderquist v. McGough Bros.*, 210 Minn. 123, 125, 297 N.W. 565, 566 (1941) (vacating an award by Industrial Commission referee).

tence but unknown at the time the award was made, is sufficient to justify the vacation of an award. *Dudansky v. L.H. Sault Constr. Co.*, 244 Minn. 369, 372, 70 N.W.2d 114, 116 (1955). Although in the latter situation there is a greater reluctance to grant a rehearing or to hold that there was an abuse of discretion in denying a petition to vacate, where the new evidence is undisputed and indicates that the injured employee has suffered substantial additional disability following the award, it is an abuse of discretion to refuse to vacate the prior award. *Guptill v. Conlon Const. Co.*, 239 Minn. 185, 189, 58 N.W.2d 264, 267 (1953) (citing *Bomersine v. Armour & Co.*, 225 Minn. 157, 161, 30 N.W.2d 526, 529 (1947); *Leland v. St. Olaf Lutheran Church*, 213 Minn. 34, 37, 4 N.W.2d 769, 771 (1942)).

■ A mistake in diagnosis or extent of disability may also serve as grounds for reopening. *Stewart*, 435 N.W.2d at 540. As Professor Larson says:

> In view of the practical protective function of workers' compensation, the desirability of preserving a right to reopen for genuine mistake seems too self-evident for argument. In the nature of things, there are bound to be many occasions when even the most thorough and skillful diagnosis misses some hidden compensable condition. Should the claimant then be penalized because of an erroneous disposition, either by award or settlement, when the only fault lies in the imperfections of medical science?

Larson & Larson, *supra*, § 131.05(2)(b). Professor Larson believes the sounder approach is that in *Mattson v. Abate*, 279 Minn. 287, 156 N.W.2d 738 (1968), a case in which the parties to the settlement had, on the basis of an erroneous medical opinion, anticipated that the employee could soon return to some type of employment. After the settlement and award, it became apparent that the employee was permanently and totally disabled. Concluding that the case involved "a grave mistake based on mistaken assumptions of fact[,]" we affirmed an order vacating the award. *Id.* at 292, 156 N.W.2d at 741.

■ Monson asserts that based on newly discovered evidence, the failed L5–S1 fusion, there was a genuine and serious mutual mistake as to the nature and severity of his injury at the time of the settlement. White Bear Mitsubishi/Western National asserts there was neither newly discovered evidence nor a mutual mistake as to a material fact where the seriousness of Monson's condition and the possibility that it could take a turn for the worse were clearly contemplated by the parties at the time of settlement. As we see it, although it was known that Monson had a serious back condition, it was not known that his persistent back pain had an objective and identifiable medical cause or that it would disable him from all work on a permanent basis. Instead, due to the difficulty in identifying the cause of Monson's persistent pain, the medical records indicate that his "back pains had been attributed to that last refuge of the baffled diagnostician emotional instability." Larson & Larson, *supra*, § 131.05(2)(b). Following a pain management program, Monson was referred for counseling and pool therapy.

Moreover, Monson was medically authorized to work fulltime subject to restrictions at the time of settlement. The settlement agreement reflects that both sides were operating on the assumption that Monson was capable of substantial gainful employment: Monson was claiming retraining and economic recovery compensation, compensation payable when post-injury employment was unsuitable; and White Bear Mitsubishi/Western National was denying those claims, asserting that Monson

had been fully paid impairment compensation, compensation due when post-injury employment was suitable. We believe the medical records and settlement agreement establish a prima facie showing of cause sufficient to justify reopening the award.

We therefore reverse the denial of the petition to vacate the award and remand for purposes of setting aside the award and granting a hearing.

Reversed and remanded.

Employee is awarded $1,200 in attorney fees.